UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL GILBERT, | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 804 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| UNION PACIFIC RAILROAD COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Michael Gilbert alleges that his employer, Union Pacific Railroad Company, is liable under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq*., for his on-the-job injury and violated the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20109 *et seq*., by firing him in retaliation for reporting his injury. Doc. 1. With discovery complete, Union Pacific moves for summary judgment. Doc. 89. The motion is denied.

### Background

The court recites the facts as favorably to Gilbert as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

Gilbert works for Union Pacific as a conductor on a commuter train operating between Waukegan and Chicago. Doc. 95 at ¶ 2. On a Friday morning in October 2017, Gilbert was working with two other conductors, Henry Martin and Joe Wright, on a train heading south to Chicago. *Id*. at ¶ 10. A passenger, Mario Watson, who smelled strongly of alcohol, was behaving in an unruly manner and threatening crew members. *Id*. at ¶ 11; Doc. 96 at ¶ 9. The

crew decided to remove Watson from the train, and Martin informed him that he would be required to disembark at the Highland Park station. Doc. 95 at ¶ 12.

When the train reached the Highland Park station, Wright opened the train doors, allowing Watson a clear path to disembark, and Gilbert exited the train and walked to the right. Doc. 96 at ¶ 13. As Watson disembarked, he shouted at Gilbert that he would "whip his ass," clenched his fist, walked toward Gilbert, and "chest bumped" him. *Ibid.*; Doc. 95 at ¶ 14. Gilbert stepped back and told Watson to back up, but Watson kept advancing. Doc. 96 at ¶ 13. Gilbert then punched Watson and the two started fighting. Doc. 95 at ¶ 16. Gilbert ended up on the ground and hit his head on the concrete. Doc. 96 at ¶ 14. In addition, Gilbert was punched in the back of the head, briefly lost consciousness, and injured his left hand. *Ibid*.

Martin pulled Watson off of Gilbert, and the police arrived. Doc. 95 at ¶ 17; Doc. 96 at ¶ 8. Watson was still acting aggressively—shouting, cursing, pacing, and flailing his hands— and continued to smell strongly of alcohol. Doc. 96 at ¶ 8. One of the police officers testified that she felt that Watson was "potentially a threat" to her. *Ibid*. Gilbert was transported to Highland Park Hospital, where he received a CT scan to evaluate his head injury. Doc. 95 at ¶ 18; Doc. 96 at ¶ 15. Prior to the incident, neither Union Pacific nor Gilbert knew that Wilson posed a security threat. Doc. 95 at ¶ 36.

The stationmaster informed Sean McGovern, Union Pacific's Director of Road Operations, that Gilbert had been transported to the hospital after an altercation with a passenger. *Id*. at ¶ 19. McGovern relayed the information to Jason Reed, Union Pacific's Superintendent of Commuter Operations, and then met Gilbert in the hospital. *Ibid*.; Doc. 96 at ¶¶ 16-17. McGovern told Gilbert that he had done nothing wrong and had nothing to worry about, as he was merely defending himself. Doc. 96 at ¶ 16.

After his discharge from the hospital that day, Gilbert went to Union Pacific's office at Ogilvie Transportation Center, where he spoke to a risk management representative, gave a recorded statement, and completed a "report of personal injury" form. Doc. 95 at ¶ 24; Doc. 96 at ¶ 17. The risk management representative completed a "Railroad Employee Injury and/or Illness Record" stating that Gilbert had sustained injuries to "multiple body parts bruise or contusion" and received medical care, including "MRI, first aid to cut, cast, PT, Norco 5/325, Valium 5mg." Doc. 96 at ¶ 18.

Gilbert then discussed the incident with Reed, who said that he had done nothing wrong by defending himself and that they would see each other on Monday. *Id*. at ¶ 17. Reed testified that when he asked Gilbert if he was hurt in any way or if he felt he could not return to work, Gilbert responded that he was not injured. Doc. 95 at ¶ 26. Gilbert also spoke to Craig Lockhart, his supervisor, who completed a Manager's Accident/Injury Report stating that he had sustained injuries to multiple body parts, for which he had received an MRI and first aid. Doc. 96 at ¶ 19. That night, McGovern, Reed, and Lockhart determined that the incident warranted a formal investigation. Doc. 95 at ¶ 23.

The next day, a Saturday, Gilbert went to Immediate Care, where a physician told him that he should not return to work due to his injuries. *Id*. at ¶ 27; Doc. 96 at ¶ 21. On Sunday morning, Gilbert called the Union Pacific health department in Omaha to request a medical leave of absence and was told that his request was temporarily approved, pending paperwork. Doc. 95 at ¶ 27. When Gilbert called commuter control on Sunday night to be relieved from duty on Monday, he was informed that the necessary paperwork had not been received from Omaha and that he would have to use sick time. *Id*. at ¶ 28.

3

Gilbert testified that, after he advised his managers that he was seeking a medical leave of absence, their attitude toward him and the incident changed. Doc. 96 at ¶ 23. On Monday, Lockhart told Gilbert that he was being pulled from service pending an investigation. *Id*. at ¶ 24. Gilbert received a notice of investigation on November 3, informing him that he was charged with a possible violation of three Union Pacific rules—Rule 1.6, "Conduct, Quarrelsome"; Rule 1.7, "Altercations"; and Rule 1.13, "Reporting and Complying with Instructions"—which could result in dismissal. Doc. 95 at ¶ 30.

McGovern testified at his deposition that Union Pacific has a "zero tolerance" policy concerning employees acting in a quarrelsome manner, and that the discipline for doing so with a passenger is termination. *Id*. at ¶ 9. Reed testified at his deposition that Union Pacific has a "zero tolerance" policy concerning violence in the workplace, but that an employee who became involved in a "violent [or] threatening situation" as the victim would not be terminated. *Ibid*.; Doc. 96 at ¶ 28. Union Pacific Manager Conrad Banda testified that "if a conductor is being assaulted … they have a right to defend themselves." Doc. 96 at ¶ 31.

In early December 2017, Union Pacific held an investigative hearing, and Gilbert was terminated later that month based on the investigation's findings. Doc. 95 at ¶¶ 31, 39. Reed made the "ultimate decision" to terminate Gilbert, and McGovern participated in the decisionmaking process. *Id*. at ¶ 40; Doc. 98 at 6.

In July 2019, the National Mediation Board found that the evidence did not support Union Pacific's conclusion that Gilbert had violated Rules 1.6, 1.7, or 1.13. Doc. 96 at ¶ 30. Gilbert was reinstated and remains employed by Union Pacific. Doc. 95 at ¶ 2.

Union Pacific has an "Ejection of Passengers" policy, which states:

4

> Ejection of our customers is a last resort. Every attempt must be made to utilize calm and reason when handling these Situations. The following guidelines must be used when it becomes necessary to eject a passenger:
>
> If practicable you must enlist the assistance of a fellow train crew member.
>
> Passengers may only be removed from the train when they are placed in the custody of the police or another responsible authority.
>
> Crew members will not warn a passenger that they have the option to leave the train or be arrested.
>
> Make every attempt to diffuse the situation. Reason with the customer when possible.
>
> Unless an emergency situation exists, do not inform the engineer or commuter control with the customer present. This often increases the hostility and tension of the situation.
>
> 'Ejection/Confiscated Ticket Report' must be filled out and submitted to Commuter Control for anyone ejected or refused boarding.

*Id*. at ¶ 5. Prior to the incident, Gilbert did not receive any formal training on implementing the policy or how to deal with aggressive or intoxicated passengers or passengers threatening violence. Doc. 96 at ¶¶ 3-6.

## Discussion

**I.  FELA Claim**

The FELA "provides a federal remedy for railroad employees who are injured on the job." *Abernathy v. E. Ill. R.R. Co*., 940 F.3d 982, 988 (7th Cir. 2019). It states, in relevant part, that "[e]very common carrier by railroad … shall be liable in damages to any person suffering injury while he is employed … for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. "In so providing, the FELA imposes on railroads a general duty to provide a safe workplace." *Holbrook v. Norfolk S. Ry. Co*., 414 F.3d 739, 741 (7th Cir. 2005) (internal quotation marks omitted).

5

"To prove a claim under the FELA, a plaintiff must prove the traditional common law elements of negligence, including foreseeability, duty, breach, and causation." *Abernathy*, 940 F.3d at 988 (internal quotation marks omitted). "However, because it is meant to offer broad remedial relief to railroad workers, a plaintiff's burden when suing under the FELA is significantly lighter than in an ordinary negligence case. A railroad-employer is liable where 'employer negligence played any part, even the slightest, in producing the injury.'" *Ibid*. (alterations and internal quotation marks and citations omitted) (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1957)).

Gilbert claims that Union Pacific negligently failed to provide reasonably safe working conditions by failing to train him in "how to defuse aggressive passenger behavior and prevent physical altercations." Doc. 98 at 4-5. Union Pacific presses three grounds for summary judgment on that claim: first, that Gilbert was not acting within the scope of his employment when he was injured; second, that it was not foreseeable that Watson or other unruly passengers might threaten conductor safety; and third, that Union Pacific's training and policies are sufficient to protect employees. Doc. 91 at 4-9. All three grounds are without merit.

### A. Scope of Employment

The FELA "has uniformly been read as requiring a … claimant to prove that he was injured while in the scope of his employment." *Wilson v. Chi., Milwaukee, St. Paul, & Pac. R. Co.*, 841 F.2d 1347, 1351 (7th Cir. 1988). Because the FELA "does not use the terms 'employee' and 'employed' in any special sense," the court "appl[ies] common law principles, as interpreted by other federal courts," to ascertain a plaintiff's "scope of employment." *Id*. at 1352 (internal quotation marks omitted). The "settled common law standard for defining scope of employment" is provided by the Restatement (Second) of Agency: "To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to

the conduct authorized." *Ibid*. (quoting the Restatement (Second) of Agency § 229 (1957)); *see also Rogers v. Chi. & N. W. Transp. Co.*, 947 F.2d 837, 839 (7th Cir. 1991) ("[I]n order for an activity to qualify as being within the scope of employment, it must be a necessary incident of the day's work or be essential to the performance of the work.").

Union Pacific admits that Gilbert's "job duties … include escorting passengers off the train when necessary," but argues that his getting into a fight with Watson was "[n]ot only … not authorized or incidental to conduct authorized by Union Pacific, it was in direct contradiction to Union Pacific's rules and regulations." Doc. 91 at 5. That argument fails on summary judgment because the record, viewed in the light most favorable to Gilbert, allows a reasonable factfinder to conclude that Gilbert's conduct was authorized. According to Gilbert, both McGovern and Reed told him that he had done nothing wrong by defending himself, Doc. 96 at ¶¶ 16-17, and Banda testified that a conductor being assaulted has a right to defend himself, *id*. at ¶ 31. Although Reed testified that Union Pacific has a "zero tolerance" policy concerning violence, he added that an employee involved in a "violent [or] threatening situation" as the victim would not be terminated. Doc. 95 at ¶ 9; Doc. 96 at ¶ 28. Moreover, the National Mediation Board found that Gilbert had not violated any of the Union Pacific rules that he had been fired for violating, further suggesting that he was at least implicitly authorized to defend himself from Watson while escorting him off the train. Doc. 96 at ¶ 30.

Even if the altercation indisputably was *un*authorized, Union Pacific still would not be entitled to summary judgment, as a reasonable factfinder could conclude that the fight was within the scope of Gilbert's employment. As the Seventh Circuit has explained, "[e]ven if [the employee's behavior] was not authorized, or required, it could still have been within the scope of his employment." *Wilson*, 841 F.2d at 1355. Put another way, "the mere fact that an employer

has forbidden his servant to do something, or to accomplish a task in a particular way, is not enough to defeat a finding that the act was within the scope of employment. This rule holds even if the employer has specifically forbidden the employee to do the act in question." *Ellerth v. Burlington Indus., Inc.*, 102 F.3d 848, 858 (7th Cir. 1996), *vacated on other grounds by Jansen v. Packaging Corp. of Am.*, 123 F.3d 490 (7th Cir. 1997). Thus, conduct falls outside of the scope of employment "only if it is done with no intention to perform it either as a part of, or incident to, a service for which the servant is employed." *Ibid*. In deciding whether conduct fell within the scope of an employee's employment, "the court focuses on whether the employer had the right to control the servant's actions at the time of the tortious occurrence, not on whether it expressly authorized the tort itself. It is plain that a principal would not instruct or authorize an agent to perform tasks negligently, or fraudulently, or in a manner harmful to others, but a finding that conduct was negligent, fraudulent, or harmful does not defeat a conclusion that it was within the scope of employment." *Ibid*.

A reasonable factfinder could conclude that Gilbert's altercation with Watson was "part of, or incident to, a service for which [Gilbert was] employed." *Ibid*. As noted, Union Pacific concedes that Gilbert's job duties included escorting passengers off the train. Doc. 91 at 5. And there is no dispute that the altercation occurred as Gilbert was escorting Watson off the train. Doc. 96 at ¶ 13. Even if Gilbert violated Union Pacific's policies by punching Watson in response to his "chest bump," a reasonable factfinder could conclude from the evidence that Union Pacific "had the right to control [Gilbert's] actions at the time." *Ellerth*, 102 F.3d at 858. After all, Union Pacific's "Ejection of Passenger" policy sets forth the steps that conductors are expected to follow in removing a passenger from the train. Doc. 95 at ¶ 5. It follows that the

8

question whether the altercation was within the scope of Gilbert's employment cannot be resolved on summary judgment.

### B. Foreseeability

"For claims about unsafe work conditions, an essential element of a [FELA] claim is foreseeability, or whether there were circumstances which a reasonable person would foresee as creating a potential for harm." *LeDure v. Union Pac. R.R. Co.*, 962 F.3d 907, 910 (7th Cir. 2020) (internal quotation marks omitted). In other words, "[t]he plaintiff must show that the employer had actual or constructive notice of th[e] harmful circumstances." *Ibid.* (internal quotation marks omitted).

Union Pacific argues that it had no reason to expect "disruptive behavior [from] Mr. Watson or [] any generalized threat by passengers to trainmen" and had no "actual or constructive knowledge of frequent issues with unruly or disruptive passengers." Doc. 91 at 7. That argument has no merit. Union Pacific's "Ejection of Passenger" policy expressly envisions that it may "become[] necessary to eject a passenger" from the train in a "hostil[e] and tens[e] … situation" requiring the transfer of the passenger to police custody. Doc. 95 at ¶ 5. The existence of this policy demonstrates that Union Pacific was aware that passengers might be so disruptive or threatening that they must be removed from a train against their will. Moreover, the policy requires employees to fill out an "Ejection/Confiscated Ticket Report" whenever a passenger is ejected, suggesting that the need to eject passengers occurs with sufficient regularity that Union Pacific has a dedicated form for documenting ejections. *Ibid.* Given all this, a reasonable jury could conclude that Union Pacific was aware that unruly or disruptive passengers might threaten crew members.

Union Pacific's argument that it is not liable under the FELA because it could not have specifically foreseen that *Watson* posed a threat is misplaced. "The test of foreseeability does

9

not require that the negligent person should have been able to foresee the injury in the precise form in which it in fact occurred. Rather it is sufficient if the negligent person might reasonably have foreseen that *an* injury might occur." *Mullahon v. Union Pac. R.R.*, 64 F.3d 1358, 1364 (9th Cir. 1995) (collecting cases). For instance, in *Gallick v. Baltimore & Ohio Railroad Co.*, 372 U.S. 108 (1963), the Supreme Court held that a plaintiff's injury from being bitten by an insect attracted to a stagnant pool of water was foreseeable to the defendant railroad company because it "knew that the accumulation of the pool of water would attract bugs and vermin to the area," even though it could not foresee that a particular type of insect posed a safety risk. *Id*. at 118-19. It is likewise immaterial that Union Pacific did not foresee that Watson in particular posed a threat to crew members, as it foresaw that unruly and belligerent passengers in general could pose such a threat.

### C. Breach of Duty to Provide a Safe Workplace

Last, Union Pacific contends that there is "no evidence" that it breached its duty to provide a safe workplace, reasoning that its "safety training, rules, policies, and procedures … , if followed correctly, are []sufficient to protect employees." Doc. 91 at 8. Specifically, Union Pacific argues that Gilbert would not have been injured had he followed the "Ejection of Passenger" policy's requirement that "[p]assengers may only be removed from the train when they are placed in the custody of the police or another responsible authority." *Ibid*.; Doc. 95 at ¶ 5. This argument fails as well.

"Under the [FELA], an employer must not only promulgate safety rules but also enforce those rules and may be held liable for the failure to do so." 30 Corpus Jurus Secundum, Employers' Liability § 177 (March 2022). Moreover, "a FELA case should go to a jury if even the slightest of facts support a finding of negligence." *Ruark v. Union Pac. R.R. Co.*, 916 F.3d

619, 625 (7th Cir. 2019). Gilbert testified that, prior to his injury, he did not receive formal training on implementing the "Ejection of Passenger" policy or on handling belligerent and/or intoxicated passengers. Doc. 96 at ¶¶ 3-6. A reasonable jury could find that Union Pacific failed to exercise reasonable care by promulgating the "Ejection of Passenger" policy without training its employees on how to implement it.

## II.  FRSA Claim

The FRSA prohibits a railroad company from retaliating against an employee for reporting a workplace injury. *See* 49 U.S.C. § 20109(a)(4) ("A railroad carrier … may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done … to notify … the railroad carrier … of a work-related personal injury … ."). To establish a *prima facie* case of retaliation under the FRSA, a plaintiff "must show that: (1) he made an injury complaint in good faith (i.e., engaged in a protected activity); (2) the rail carrier knew of the complaint; (3) he suffered an adverse employment action; and (4) the complaint was a contributing factor in the adverse action." *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 381 (7th Cir. 2018). "Once that showing is made, the rail carrier can still escape liability if it can show, by clear and convincing evidence, that it would have taken the same action absent the protected activity." *Ibid*.

Focusing on the second element of Gilbert's *prima facie* case, Union Pacific contends that there is no evidence that Reed or McGovern, the supervisors who decided to terminate Gilbert, knew that he had reported his injury or requested a medical leave of absence. Doc. 91 at 9-11. That matters, says Union Pacific, because "[a]lthough not discussed by the Seventh Circuit, other federal courts have held that '[t]he knowledge relevant for a retaliation claim under the FRSA must be tied to the decision-maker involved in the unfavorable personnel action.'" *Id*.

11

at 9 (quoting C*onrad v. CSX Transp., Inc*., 824 F.3d 103, 108 (4th Cir. 2016)). That is not the correct legal standard in the Seventh Circuit. Specifically, in *Armstrong*, issued two years after the Fourth Circuit's decision in *Conrad*, the Seventh Circuit held that an FRSA retaliation plaintiff must show only that "the *rail carrier* knew of the [plaintiff's] complaint." 880 F.3d at 381 (emphasis added). Circuit law therefore does not require Gilbert to prove, as part of his *prima facie* case, that the particular individuals who terminated him knew about his injury report. And it is undisputed that Union Pacific as an entity knew of Gilbert's injury report and request for medical leave, both of which he made through official Union Pacific channels. Doc. 95 at ¶ 27; Doc. 96 at ¶¶ 18-19.

Even if Seventh Circuit precedent required such knowledge on the part of Reed and McGovern, Gilbert adduces circumstantial evidence sufficient for a reasonable factfinder to conclude that they were aware of his injury report and medical leave request. On the day of the incident, Gilbert reported his injury to a Union Pacific risk management representative and to Lockhart, his supervisor, and both completed employee injury report forms reporting that Gilbert had sustained injuries to "multiple body parts." Doc. 96 at ¶¶ 17-19. It is reasonable to infer that Reed and McGovern were made aware of those reports before deciding to terminate him, especially because one of the reports was completed by Lockhart, who was part of a discussion with Reed and McGovern the evening of the incident in which they decided to open a formal investigation. Doc. 95 at ¶ 23. Moreover, Gilbert testified that Reed and McGovern had initially assured him that he had done nothing wrong and had nothing to worry about, but that after he requested a leave of absence, their attitude toward him and the incident changed. Doc. 96 at ¶¶ 16-17, 23. In addition, Reed's comment to Gilbert after he was released from the hospital that he would "see him on Monday" suggests that, at the time Reed assured Gilbert that he had done

12

nothing wrong, Reed did not expect Gilbert to request a medical leave of absence. *Id*. at ¶ 17. This evidence gives rise to a reasonable inference that McGovern and Reed changed their assessment of Gilbert's altercation with Watson *because* they had learned about his injury report and leave request.

Next, focusing on the fourth element of Gilbert's *prima facie* case, Union Pacific argues that there is no evidence that his injury report or leave request played any role in his termination. Doc. 91 at 11-13. "[A] FRSA plaintiff need not show that retaliation was the *sole* motivating factor in the adverse decision[; rather], the statutory text requires a showing that retaliation was *a* motivating factor." *Armstrong*, 880 F.3d at 382. This "'contributing factor' standard is lower than those applied in other anti-discrimination contexts." *Ibid*. "Evidence which may indicate a link between the protected activity and the allegedly adverse actions include … a change in the employer's attitude toward the complainant after he or she engages in protected activity." *Cyrus v. Union Pac. R.R. Co.*, 2015 WL 5675073, at *11 (N.D. Ill. Sept. 24, 2015).

Contrary to Union Pacific's submission, there is sufficient evidence from which a reasonable factfinder could conclude that Gilbert's injury report and medical leave request were at least *a* factor in his termination. As noted, according to Gilbert, both Reed and McGovern's behavior changed markedly after he reported his injury and requested a medical leave, from assuring him that he had done nothing wrong and had nothing to worry about to determining that his role in the incident warranted termination. That alone is sufficient evidence of pretext to survive summary judgment. *See ibid*. (holding that a "change in the employer's attitude toward the complainant after he or she engages in protected activity" provides evidence of pretext). The fact that the National Mediation Board found that Gilbert had not violated any rule that he had been terminated for violating, Doc. 96 at ¶ 30, further suggests that Union Pacific's justification

for firing him was pretextual. Accordingly, Gilbert has adduced evidence sufficient to satisfy the fourth element of his *prima facie* case.

Last, Union Pacific argues that even if Gilbert has established a *prima facie* case, it is clear from Union Pacific's policies that he would have been terminated regardless of his injury report and medical leave request. Doc. 91 at 13-15. That argument fails to persuade. As noted, the National Mediation Board found that Gilbert had not violated any rule that he was terminated for violating, and Gilbert was reinstated as a result of the Board's finding. Doc. 95 at ¶ 2; Doc. 96 at ¶ 30. It necessarily follows that it is not at all clear that Gilbert would have been terminated under a properly neutral application of Union Pacific's policy; in fact, the evidence arguably supports the opposite conclusion. Moreover, there is substantial additional evidence that Gilbert's behavior did not warrant termination under Union Pacific's policies, as Reed and McGovern initially assured Gilbert that he had done nothing wrong, Reed testified that the "zero tolerance" policy on violence does not apply to victims of a "violent [or] threatening situation," and Banda testified that a conductor being assaulted has a right to defend himself. Doc. 96 at ¶¶ 16-17, 28, 31. Union Pacific thus cannot show by clear and convincing evidence, at least on summary judgment, that Gilbert would have been terminated regardless of his injury report and medical leave request.

Accordingly, Gilbert's FRSA claim survives summary judgment.

## Conclusion

Union Pacific's summary judgment motion is denied. This case will proceed to trial.

May 17, 2022

_____
United States District Judge

14